Matias SANDOVAL et ux., Appellants,

v.

Jack RATTIKIN, Trustee, Appellee.

No. 73.

Court of Civil Appeals of Texas.

Corpus Christi.

Feb. 25, 1965.

First Motion for Rehearing Denied
Oct. 28, 1965.

Second Motion for Rehearing Denied
Nov. 18, 1965.

Roger Butler and Ted L. Schafer, of Law Offices of Roger Butler, Robstown, for appellants.

Richard Owens, Fort Worth, Alston Terry, Corpus Christi, for appellee.

NYE, Justice.

This is a trespass to try title action filed by Jack Rattikin, Trustee, against Matias Sandoval and wife Teresa Sandoval, appellants. The appellants filed their answer, a plea of not guilty, in the trial to the court without a jury. Judgment was rendered for title and possession for appellee Rattikin. Appellants have perfected their appeal to this Court.

The record contains a statement of facts. No findings of fact or conclusions of law were requested by either party or filed by the trial court. The appellants do not attack the sufficiency of the evidence produced by appellee at the trial, nor do they contend that the trial court was not authorized to enter judgment.

The appellants filed a motion for new trial contending in effect that they had a complete and meritorious defense and had it not been for the lack of adequate representation by their attorney a different result would have been obtained in the trial.

The trial court conducted a complete and thorough hearing on appellants' motion for new trial. The hearing on the motion for new trial contained 128 pages of testimony in the statement of facts. The record at the hearing on the motion for new trial showed that the appellee had filed suit against the appellants over three years prior to the trial of the case. Appellants immediately employed an attorney to represent them who filed the answer. Appellee made numerous requests for setting of the case. Two weeks prior to the final setting, appellants' attorney filed a motion requesting permission to withdraw for the reason that the appellants had refused to cooperate with him in the defense of the case. This attorney suggested that appellants contact another attorney. The appellants contacted the Legal Aid attorney, a Mr. Henry, a lawyer of some fifty-two years of experience who agreed to represent and did represent the appellants at the trial. He interviewed the appellants on two occasions prior to the trial. Mr. Henry did not ask

for a continuance, but announced ready and proceeded to trial. He stated to the court that the appellants' original attorney had withdrawn from the case and that the appellants had come to him stating that they were unable to pay an attorney to represent them and that he agreed to represent them. He objected to the introduction of one of the deeds on the ground that the appellants claimed that it was a mortgage and not a deed, and placed both of the appellants on the stand to testify. The trial court overruled the objection and, upon the close of the testimony, rendered judgment for appellee. Appellants discharged Mr. Henry and employed a third attorney who filed a motion for new trial and prevailed on the trial court to conduct a thorough hearing on the merits of the case. This, the trial court did. During the hearing on the motion for new trial the appellants attempted to prove their defense to the main suit, contending the deed from the appellants to the appellee's predecessor in title was in reality a mortgage and that the appellee had constructive notice of such fact prior to his purchase.

A motion for new trial primarily consists of re-examination of the issues forming a basis for probable error with a view by the trial court to correct errors that have occurred in the course of the preceding trial. The object is to point out and call to the attention of the trial judge such errors complained of, so that he may have an opportunity if need be to correct them. Stillman v. Hirsch, 128 Tex. 359, 99 S.W.2d 270 (1936). Generally, the new trial may be granted and a judgment set aside where the motion shows good cause and the errors complained of affected the result of the trial, or might have reasonably affected the result, so as to justify or require the granting of a new trial. Rule 320, Texas Rules of Civil Procedure. The complaining party must show that their complaint was a material one and that injury has been done so that a fair and impartial trial has not been had. The hearing on the motion for new trial is not a

means by which the case may be tried over or tried differently. Crossley v. Crossley, 306 S.W.2d 388 (Tex.Civ.App.1957).

Appellants' first and second points complain of the trial court's ruling in overruling their motion for new trial because the trial court's implied findings in its order in overruling the motion was to the effect that appellee had knowledge of circumstances which would be reasonably calculated to put him on notice of a simulated conveyance. Appellants do not attack the main case, but in effect contend that sufficient evidence was presented during the hearing on the motion for new trial as would entitle them to a judgment had such defense been presented completely in the main case, and, therefore, the court erred in not granting a new trial.

■ The application for new trial is addresssed largely to the sound discretion of the court. 41 Tex.Jur.2d 59 § 21. The hearing on the motion should be presented to the court to show that the substantial rights of the parties have been violated and to make it reasonably clear that a fair trial had not been bad. Hartford Accident & Indemnity Company v. Gladney, 335 S.W.2d 792 (Tex.Civ.App.1960, wr. ref., n. r. e.). The evidence adduced at the hearing on the motion for new trial was not claimed to be newly discovered evidence. The record clearly shows that the appellants were given ample opportunity to develop the evidence that might have constituted their defense, not only during the first trial, but again during the hearing on the motion for new trial. The trial court did not find that appellants were entitled to a new trial and overruled their motion.

■ Trial judges should properly exercise the power of granting a new trial in order to protect a litigant from definite wrong. The discretion of a trial court in granting a new trial is practically unlimited. On appeal, however, it is not our duty to pass on the equities of the case or to substitute our discretion for that of the trial court, but to determine whether or not the trial court abused its discretion in refusing to grant a new trial. On the hearing on the motion for new trial, based on the alleged error that appellants had a complete defense to the suit, the movants must show that they were not afforded an opportunity to present such defense, without any fault of their own, and that the failure of the trial court to grant them a new trial for this reason, was an abuse of its discretion in such matters. We do not find that appellants were not afforded an opportunity to present their defense, or that there was sufficient evidence of a meritorious defense presented during the hearing on the motion for new trial for us to say that the eminent trial judge who heard the case tried originally and presided over the hearing on the motion, abused his discretion in denying appellants a new trial.

■ Other facts developed at the hearing on the motion for new trial showed that the appellants deeded the property in question to Bosquez in an instrument dated February 14, 1950. The deed was recorded in the Deed Records of Nueces County on the 3rd day of March, 1950. Appellee purchased the property from Bosquez on December 28, 1958. Appellants remained in possession of the property. It is undisputed that the deed from the appellants to Bosquez was on its face an absolute and unconditional conveyance of the property in question. As a general rule, when possession is held by one other than the vendor of the record title, the purchaser is charged with knowledge or put upon inquiry as to the rights of the possessor, the same as though such rights were of record. However, in the absence of knowledge of any facts to the contrary, the purchaser is not bound to make inquiry beyond the recorded deed executed by the one in possession purporting to convey the land to the person from whom the purchaser is acquiring same. Williams v. Rabb, 161 S.W.2d 121 (Tex. Civ.App.1942, wr. ref.); Eylar v. Eylar, 60 Tex. 315; National Bond & Mortgage Corporation v. Davis, Tex.Com.App., 60

S.W.2d 429; Park v. Sweeten, 270 S.W.2d 687 (Tex.Civ.App.1954), affirmed 154 Tex. 266, 276 S.W.2d 794; Baylor v. Ramos, 290 S.W.2d 273 (Tex.Civ.App.1956, ref., n. r. e.); 43B Tex.Jur. 65 § 754; Dorsey v. Temple (Tex.Civ.App.), 103 S.W.2d 987, 995, states the applicable rule:

"A rule of property has long been established in this state that where a grantor, after executing a deed to land, absolute and unconditional on its face, continues to remain in possession, a purchaser from the grantee may rely upon the terms of the deed as a declaration of the grantor that he has parted with title, and, as a matter of law, is relieved of further inquiry."

We do not find that there was any substantial evidence of any facts shown during the trial or the hearing on the motion for new trial that would put the appellee on notice or inquiry of any of the contended adverse rights of the appellants.

■ On appeal from an order overruling the motion for new trial the appellate court will take the most favorable view of the evidence that the trial court was authorized to take. The order overruling the motion for new trial amounts to an implied finding adverse to the allegations in the motion and the reviewing court will assume that the trial court found adversely as to all material facts alleged by the complainant. Liberty Cab Co. v. Green, 262 S.W.2d 522 (Tex.Civ.App.1953 wr. ref., n. r. e.); 41 Tex.Jur.2d 470, § 218.

■ Appellants' remaining points complain of the trial court's failure to grant them a new trial because their second attorney (the Legal Aid attorney) admitted he did not have time to prepare and present the appellants' case, and, therefore, appellants' present attorneys claim a violation of the appellants' rights to adequate representation under Amendment XIV of the Constitution of the United States. Appellants' Legal Aid attorney admitted he had considerable title experience and had worked in a title company previously. Although the attorney did not press the defense now urged by the appellants, that the deed should be construed to be a mortgage, he did see to it that the appellee proved his case at the trial. No objection is made here that the proof was insufficient. We do not know whether such attorney at the time of the original trial planned on a third-party action against Bosquez or some other party. However, the appellants' trial attorney made no such admission until after the trial court had ruled against him and he had lost his case. Appellants' points are overruled. In the absence of fraud, a party is as fully concluded by the acts of his attorney as if he were acting for himself. The court will not set aside the judgment because of the negligence or the mistakes of his attorney. 34 Tex.Jur.2d 68, § 213; 25 Tex.Jur. 614, § 206, and cases cited therein; Estey and Camp v. Luther, 142 S.W. 649 (Tex.Civ.App.1911, wr. ref.); O'Quinn v. Tate, 187 S.W.2d 241 (Tex.Civ.App.1945 wr. ref.).

■ Appellants argue that after the trial of the main case and after they had notified Mr. Henry (the Legal Aid attorney) through their newly acquired lawyers, that they had employed different attorneys, Mr. Henry approved the judgment as to form so as to cause the judgment to be entered by the trial court. The appellants contended that such unauthorized act by Mr. Henry entitled them to a new trial. Citing Metts v. Waits, 286 S.W. 923 (Tex. Civ.App.1926); Maeding v. Maeding, 155 S.W.2d 991 (Tex.Civ.App.1941). These cases are not in point. It is not a condition precedent to the proper entry of a judgment for opposing counsel to approve the judgment as to form prior to its entry by the trial court. This is a matter of professional courtesy and its lack of approval as to form does not render such entry of the judgment invalid.

■ Appellants contend that the trial court has the responsibility of appointing an attorney under Article 1917, Vernon's Ann. Tex.Civ.St. This article provides that

894

judges of district courts may appoint attorneys to attend a party who is too poor to employ counsel to attend to the same. /This provision is not mandatory. There is nothing in the record that indicates that appellants brought this to the attention of the trial court. The appellants did not file any affidavit that they were to poor to employ counsel. They were represented at three different stages of the law suit by three sets of attorneys. We do not find that their rights have been violated under Article 1917, V.A.T.S., or under Amendment XIV of the Constitution of the United States./

Appellants do not claim nor was there any evidence of fraud on the part of the appellee. Appellants do not attack the judgment as not being in accord with the evidence or ruling of the trial court on the trial of the merits. Appellants have not shown that they have a meritorious defense as a matter of law, that they were prevented from urging because they were not represented or inadequately represented by counsel at the trial. The trial court heard all the facts (at two different occasions) and did not determine that the appellants had, or were deprived of the opportunity of showing a meritorious defense. We do not think in view of the record as a whole, that the trial court abused its discretion in overruling the appellants' motion. Watson v. Todd, 322 S.W.2d 422, (Tex.Civ.App.1959); Hartford Accident & Indemnity Co. v. Gladney, supra.

The judgment of the trial court is affirmed.

1. In the lower court it was necessary for the Sandovals to testify with the aid of the Official Spanish Court Interpreter. The Record of the hearing on the motion for new trial shows that in 1950, when they executed (Mrs. Sandoval signing by mark) an instrument to M. G. Bosquez, Rattikin's Grantor (said instrument being relied on by Rattikin as a deed, and claimed by the Sandovals to be a mortgage) neither of the Sandovals could speak, read or write the English language. Even in 1963, Mr. Sandoval testified that he could speak English only "a little."

SHARPE, Justice (dissenting).

I respectfully dissent.

On the hearing of the appellants' (Sandovals') motion for new trial below it was conclusively established that they had not been accorded their day in court nor their right to due process of law under the Fourteenth Amendment to the Constitution of the United States of America. In my opinion, the lower court should have set aside the judgment under which the Sandovals lost their homestead and granted them the new trial which they sought.

The legal injustice in this case was brought about because the Sandovals, due to their poverty and inability to employ an attorney of their own selection, were required at the trial to rely upon the services of a legal-aid attorney furnished by the county, and such attorney failed to render the effective assistance of counsel to which they were entitled, in that he did not present the necessary and available defense of the Sandovals, which, if established, would have defeated appellee's (Rattikin's) suit.

The Sandovals are illiterate, non-English speaking indigents of Mexican extraction,[1] who were sued for title and possession of their homestead in which they had resided for many years.[2] After the trial of their case in which they were purportedly represented by legal-aid counsel, when the Sandovals discovered their homestead had been lost, they enlisted the services of attorneys of their own selection who thereafter represented them on their motion for

2. The Sandovals had lived on the property here involved since about 1945. They purchased it as a vacant lot and built a house on it of twelve by twenty feet, consisting of two rooms and a kitchen. They reared a family of nine children there, five of whom were still living at home at the time of the original trial herein on August 7, 1963. Some improvements, which were made to the homestead in the year 1953, will be discussed hereafter.

new trial in the lower court and on this appeal.

The legal-aid attorney made a number of serious mistakes which, in my view, operated to deny his indigent, involuntary clients a fair trial. The contentions made by the Sandovals, through their present counsel, on this appeal present important questions concerning the subjects of the duty of an attorney to his clients, what an indigent defendant in a civil case can reasonably expect from an attorney furnished by the legal-aid office of a county or under appointment of the court, judicial sensitivity to the duty of protecting constitutional rights and to due process of law, and the responsibility of furnishing judicial guidance necessary to achieve such purposes in civil cases involving property rights.

Since it appears that the county actually furnished legal-aid counsel to the Sandovals in this case, we are not called upon to decide any question relating to the obligation in the first instance of the state or county to furnish counsel to an indigent in a civil case. However, the questions which are squarely presented, and which we must squarely face are as follows: Where an indigent defendant is furnished legal-aid counsel in a civil case by a county (a subdivision of the State of Texas), does the failure of such counsel to render effective assistance in the protection of the property rights of the client, resulting in the loss of same, amount to a denial of due process of law under the Fourteenth Amendment to the Constitution of the United States? Where such a showing is properly made after entry of judgment, does the failure of the court to grant a motion for new trial amount to a denial of such due process?

The Fourteenth Amendment to the Constitution of the United States provides, in part, as follows:

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Although there are a few civil cases dealing with the subject, most of the decisions concerning the meaning and necessity of the effective assistance of counsel involve criminal cases or post-conviction proceedings arising out of criminal cases. However, allowing for the fact that there is a Sixth Amendment guarantee of counsel in criminal cases and for other significant differences between criminal and civil cases, the decisions in a number of authoritative criminal cases furnish compelling analogies and guide lines for ascertaining the presence or absence of effective assistance of counsel in civil cases.

The Supreme Court of the United States has held that where life or liberty of a defendant is involved in a criminal case, there is a constitutional right to the effective assistance of counsel in state as well as in federal cases. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); Powell v. State of Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). Under the Fourteenth Amendment a defendant in a state criminal court case may not be deprived of the effective assistance of counsel without offending due process. Is due process no less offended where, as here, indigents are deprived of their property in a civil case without effective assistance of counsel? Even though the rights to be protected are different, is the meaning of effective assistance of counsel the same in civil cases involving property rights as it is in criminal cases involving life or liberty? If a litigant is too poor to secure counsel of his own choosing and is furnished counsel by appointment of the court or by the state or a sub-division thereof or by a legal-aid office, are the basic obligations and duties of the attorney to his clients, within practical limitations, the same?

This Trespass To Try Title suit was filed by Rattikin, Trustee, (appellee), against

Matias and Teresa Sandoval, husband and wife, to recover title to their homestead located in Robstown, Nueces County, Texas.

Originally, the Sandovals employed an attorney of their own selection, but he withdrew from the case when they were unable to pay him. Thereafter, the Sandovals went to the legal-aid attorney for the county, and he agreed to, and purported to, act as their attorney at a non-jury trial held on August 7, 1963. The trial could not have lasted more than about thirty minutes. Formal entry of the judgment in favor of Rattikin was made on August 12, 1963.

The Sandovals' defense which the legal-aid attorney did not present on the trial of the case was that one of the essential instruments in the chain of Rattikin's title was a mortgage and not a deed,[3] and that Rattikin had notice, or its equivalent, of such fact.[4]

A clear understanding of what took place upon the trial of this case is essential in order that the important questions presented here may be correctly resolved. A step-by-step analysis of the Statement of Facts [5] will now be made.

The judge called the case for trial and counsel for Rattikin, the plaintiff, announced ready. Legal-aid counsel then told the court that he was representing the Sandovals because their former attorney had withdrawn and they were unable to employ an attorney. Counsel for Rattikin then stated that he relied on the record title and had marked the three exhibits to support such title, that is, certified copies of the two deeds from Soward to Sandoval (Ex. 1), from Sandovals to Bosquez (Ex. 2), and the original deed from Bosquez to Rattikin (Ex. 3). Counsel for Rattikin further stated that legal-aid counsel had agreed that the certified copies of said deeds could be introduced *without their having been filed and notice given* (as is required by the Texas Rules of Civil Procedure), and he then summarized the said three exhibits. Legal-aid counsel then made an objection to the deed from the Sandovals to Bosquez, which was overruled as to admissibility but not as to effect.[6] Counsel for Rattikin then rested his case. Following such action, Matias Sandoval and his wife, Teresa Sandoval, testified in Spanish with the assistance of the Official Spanish Court Inter-

---

3. At the trial Rattikin offered no witnesses and relied solely upon three exhibits to establish his case against the Sandovals. These exhibits were: (1) Certified copy of deed from W. K. Soward to Matias Sandoval, dated July 20, 1945; (2) Certified copy of deed from Matias Sandoval and wife, Teresa Sandoval, to M. G. Bosquez, dated February 14, 1950 (the signature of Mrs. Sandoval being by mark, witnessed by two persons), and (3) Deed from M. G. Bosquez to Jack Rittikin, Trustee, dated December 22, 1958. The second deed hereinabove mentioned, from the Sandovals to Bosquez, is the instrument claimed by the Sandovals to be a mortgage.

4. It was essential for the Sandovals to establish this fact as an integral part of their defense, since the deed to Bosquez was absolute on its face and was recorded in the county where the property was situated.

5. The Statement of Facts on the original trial contains a total of 16 pages, including formal portions and certificates. The testimony, together with formal portions, objections, and colloquy between court and counsel, covers 10 pages.

6. The specific objection and ruling were as follows:
"MR. HENRY: Your Honor, we object to the introduction of this deed from Matias Sandoval and wife Teresa Sandoval to M. G. Bosquez, on the ground that it was obtained without sufficient explanation of it. The signers—that—they claimed that it was a mortgage and not a deed, that's the way they understood it. We will introduce evidence to the effect that they understood that it was a mortgage and not a deed, and the consideration as recited is ten dollars and other good and valuable considerations, paid by Mr. Bosquez, but the Defendants, Matias Sandoval and his wife thought they were signing a mortgage."
"THE COURT: Well, as to admissibility, your objection is overruled. Of course, the effect of the instrument is another matter."

preter. The legal-aid attorney asked Matias Sandoval fifteen questions of which fourteen were answered, constituting testimony to the effect that Sandoval had bought the property in question about 1944–45, had reared a family there, that some of his children were married but five of them were living at home on August 7, 1963, the date of trial herein. The one unanswered question asked by the legal-aid attorney of Mr. Sandoval was this:

"Tell the court about the transaction with Mr. Bosquez." Counsel for Rattikin objected to such question and the court reserved ruling and carried it along with the case. Legal-aid counsel did not repeat the question nor did he insist upon an answer to it nor did he ask any other question of Mr. Sandoval concerning his defense to Rattikin's suit, either concerning the deed to Bosquez or Rattikin's notice that the same was a mortgage. There is no showing that the said unanswered question was translated into Spanish and actually asked of Mr. Sandoval; and it may not have been answered on account of the interruption caused by the objection made by Rattikin's counsel. After Mr. Sandoval's testimony was concluded, the legal-aid attorney then called Mrs. Teresa Sandoval to the stand. She was asked six questions which were answered by her to the effect that she was the wife of Matias Sandoval and had lived on the property in question continuously since 1945. The legal-aid attorney did not ask Mrs. Sandoval a single question concerning the defense to Rattikin's suit. The legal-aid attorney then rested the Sandovals' case. Counsel for Rattikin did not cross-examine either of the Sandovals and offered no further evidence.

The Sandovals, through their present counsel, affirmatively established that the failure to present their defense to Rattikin's suit on the said trial was due to the failure of the legal-aid attorney to render effective assistance of counsel. This showing, made on the hearing of the motion for new trial, included the testimony of the legal-aid attorney who frankly admitted that, although he had announced ready and proceeded to trial when the case was called, he was not actually prepared for a trial in which he could present the Sandovals' defense. The legal-aid attorney gave several reasons or excuses for his said conduct.[7] However, it was made abundantly clear on said hearing that any competent attorney with only a minimum amount of time, effort and research could have been adequately prepared to present the Sandovals' defense to Rattikin's suit. The witnesses, Mrs. Rangel (Valle) and Mr. M. G. Bosquez, lived at Robstown, Texas, about 17 miles from the Courthouse at Corpus Christi, Texas, where the case was tried. They could have easily been called as witnesses on the trial as they were on the hearing of the motion for new trial, and could have been subpoenaed, if necessary. The documents offered at the second hearing, which were not offered on the trial by the legal-aid attorney, were either in possession of the Sandovals or Rattikin, and could readily have been obtained by voluntary production or by process. It clearly appears that the pre-trial efforts of the legal-aid attorney amounted to less than token preparation and his conduct in court was no more than a pro forma appearance.

Further analysis of the evidence developed on the hearing of the Sandovals' motion for new trial will point up the important

---

7. The principal reasons given by the legal-aid attorney for his lack of preparation and failure to present the defense of the Sandovals were lack of time for preparation, the crowded condition of his office, particularly, the number of cases on file; the language barrier, i.e., he could not speak Spanish and the Sandovals could not speak English. He frankly admitted that there were phases of the case he did not understand or thoroughly develop from his conversations with the Sandovals; that he did not have time to fully and adequately develop the case and prepare the defenses of the Sandovals without neglecting other business.

material facts to which we must give consideration. It was clearly shown that potent evidence could have been produced at the trial to establish that the purported deed to Bosquez was a mortgage and that Rattikin had knowledge or notice of such fact.

First of all, it was established that Bosquez and Rattikin became interested in the Sandovals' homestead property because they each wanted to collect indebtedness claimed owing to them by the Sandovals.

The indebtedness to Bosquez arose out of the poor financial condition of the Sandovals. The members of the Sandoval family engaged in seasonal work picking cotton and performing other field labor. In some years they would go to West Texas for such purposes. Work was hard to get between seasons and the Sandovals had to buy groceries on credit from Bosquez. Such grocery bill and a note at the bank, which Bosquez co-signed for Mr. Sandoval, furnished the basis for the purported deed of February 14, 1950, which instrument the Sandovals contend was only a mortgage to secure the above-mentioned indebtedness. However, the instrument on its face was an absolute deed and operated to place the apparent record ownership of the Sandovals' homestead in Bosquez. Bosquez testified that the property was a vacant lot and that he did not know, even at the time of trial in 1963, that there was a house on it. However, the Sandovals knew there was a house on the lot here involved and they continued to live in it after the execution of the purported deed to Bosquez in 1950, just as they had since 1945. The Sandovals made substantial payments (one calculation at the trial showed such payments amounted to almost $400.00) on their account to Bosquez, after said purported deed was executed. Bosquez marked the receipts which he gave to the Sandovals to show that the payment was either on the house or on the note or account. Bosquez testified that his notation of payment on the house was an honest mistake because, according to him, there was no house on the property he acquired from the Sandovals. Bosquez testified, when the question was put directly to him, that the instrument executed by the Sandovals on February 14, 1950 was a deed, given to pay for groceries and for the co-signed note at the bank. However, his words to such effect were demolished by other testimony given by him, some of which has heretofore been referred to. Bosquez said he had not seen the Sandovals' property before the purported deed of February 14, 1950 but he had seen it shortly thereafter and had last observed it in about the years 1952 or 1954, i. e., some four to six years before he deeded it to Rattikin. Bosquez testimony contained significant admissions supporting the Sandovals' position that the instrument of February 14, 1950 was, in truth, a mortgage and not a deed to him. One portion of his testimony on cross-examination is illustrative:

"Q.  All right, Is it your testimony— did I understand you right, Mr. Bosquez, that at the time of this transaction with the Sandovals there was no mention whatsoever of mortgage?

A.  No.

Q.  The word was not mentioned?

A.  No, sir.

Q.  You don't recall anything about that? You didn't tell the Sandoval's "This is just a mortgage on your property and as soon as you pay me off, then I'll release the mortgage?"

A.  No, sir.

Q.  You didn't say anything like that?

A.  I told him, "If you ever want the lot back—" —whenever he pays his debt, why I can just transfer the lot, and I waited eight years."

(S.F. pages 106–107, hearing on motion for new trial)

Bosquez testified on at least two other occasions that he "closed the deed" from the Sandovals when he made the deal with Rattikin in 1958. His testimony was full of conflicts on matters concerning which he should have been able to give clear answers. Bosquez admitted that he received Five Hundred Dollars net for the 1958 deed to Rattikin, Trustee. This was in addition to the amount of almost Four Hundred Dollars which he received from the Sandovals as payment of their old account, after the purported deed of February 14, 1950. Rattikin's counsel called Bosquez as a witness on the motion for new trial hearing, and was bound by his testimony which was unfavorable to Rattikin in many respects.

It is apparent that present counsel for the Sandovals presented evidence on the hearing of the motion for new trial that, at least, clearly and substantially raised a fact issue as to whether the purported deed of February 14, 1950, from the Sandovals to Bosquez, was, in truth, no more than a mortgage. There is authority, based upon facts no stronger than those present here, holding as a matter of law that a deed absolute on its face was actually a mortgage. See Ascension v. Saenz, 349 S.W.2d 266 (Tex.Civ.App., 1961, n. w. h., opinion by Pope, J.).

Next, let us pass to a consideration of whether Rattikin had notice of the fact that the Sandovals still claimed to own their homestead property and that their deed to Bosquez, dated February 14, 1950 was, in fact, a mortgage, at the time he acquired a deed from Bosquez to said property on December 22, 1958.

Rattikin's involvement in this case arises from the fact that his agent issued a title policy in connection with a Mechanic's Lien Note for $1,600.00, executed by the Sandovals in 1953 for improvements to their homestead property, located on the West one-half of Lot 16, in Block 1 of Loma Linda Addition to the City of Robstown, Nueces County, Texas, being the same property involved in this suit. Someone made a mistake in drafting the Mechanic's Lien Note, and, instead of describing the Sandovals' property, incorrectly used the description of the adjoining Lot 17. The said note was originally payable to P. M. Rushing, who assigned it to Corpus Investments, Inc. Payments were made by the Sandovals on said note until July 31, 1958. Rattikin's brief, at page 14, refers to such transaction as follows:

"According to OWENS' letter, Plaintiff's Exhibit 13, which was introduced by Appellants without reservation and who are bound thereby, the SANDOVALS in 1953 put a Mechanic's Lien on Lot 17, in Block One, of LOMA LINDA ADDITION for improvements. It was intended to describe the West one-half of Lot 16, in said Block One, as that is where the improvements are located. When the SANDOVALS became in default the lien was foreclosed. It was then discovered the improvements were situated on the West one-half of Lot 16 which was owned by Bosquez. The holder of the lien had called on the Title Company for protection and the Title Company took over the Note and then purchased the West one-half of Lot 16 from Bosquez."

On the hearing of the Sandovals' motion for new trial, counsel for Rattikin offered into evidence the original Mechanic's Lien Note executed by the Sandovals and joined in offering a letter written by Rattikin's attorney addressed to the Sandovals, dated July 9, 1959, before the filing of this suit. Such evidence established that Rattikin, through his agent, had become legally involved with the Sandovals when a policy of title insurance was issued in connection with the 1953 note for improvements on their homestead, made more than three and one-half years after the purported deed to Bosquez. It thus appears that Rattikin, before he got his deed from Bosquez on December 22, 1958, had knowledge and notice brought home to him, as it had been to

the predecessor owners of the Mechanic's Lien Note (which was assigned to Rattikin in connection with his discharge of the obligation on his title policy), that the Sandovals had claimed to own their homestead property, on Lot 16, at least since 1953; that they had paid installments of principal and interest on said note as well as taxes and insurance for more than five years thereafter; and that the Sandovals were living on the said property at all material times when Rattikin suffered a loss under his title policy and when he attempted to recoup the same.

When we consider the positions of Rattikin and Bosquez in 1958 at the time the transaction was consummated whereby Rattikin got the deed to the Sandovals' homestead property, an interesting situation is presented. At that time Rattikin had knowledge or its equivalent of the facts just mentioned, and particularly that the Sandovals had made improvements on the said Lot 16 in 1953 and had made many payments on their note for same over a period of five years, as well as for taxes and insurance. Yet, according to the testimony of Bosquez, he thought that only a vacant lot was conveyed to him by the Sandovals and that he had only sold a vacant lot to Rattikin. Fortunately, we are not called upon to decide how much Bosquez, might have asked for a deed to said property (instead of the $500.00 he received) if he really believed he owned it and knew there had been a house on it since 1945 which had been improved to the extent of $1,600.00 in 1953, and that Rattikin was attempting to recoup a loss on a title policy because of the wrong description of the Sandovals' property in the note to which we have previously referred. An endorsement for credits and other items on said Mechanic's Lien Note shows a balance of $1,124.37 thereon as of July 31, 1958, apparently after the last payment made by the Sandovals. Additional endorsements on said note show that on December 23, 1958, the day after Bosquez' deed to Rattikin, credits were made on said note for $1,085.49 principal, $78.71 interest, and $38.88 balance with a notation "Transfer Balance in reserves $38.88."

The underlying facts which were necessarily involved in the transaction whereby Rattikin was called upon to make good his undertaking on a title policy and the conduct engaged in by him or his agents was more than sufficient to raise fact issues as to his knowledge or notice of the continued ownership of the property by the Sandovals and that their purported deed to Bosquez executed February 14, 1950 ,was no more than a mortgage. As an assignee of the note in question, Rattikin stood in the shoes of his predecessor owners of it, all of which involved notice to him prior to December 22, 1958 when the deed was acquired from Bosquez.

Rattikin's reliance here upon the case of Eylar v. Eylar, 60 Tex. 315 (1883), and cases following it such as Dorsey v. Temple, 103 S.W.2d 987 (Tex.Civ.App., 1937), is misplaced. The rule that a purchaser is not bound to make inquiry beyond the recorded deed executed by one in possession purporting to convey the land to the person from whom the purchaser is acquiring it, applies only where there is an "absence of knowledge of any facts to the contrary." See Williams v. Rabb, 161 S.W.2d 121 (Tex. Civ.App., 1942, wr. ref.), one of the cases relied upon by Rattikin in his brief herein. The crucial test as to knowledge or notice on the part of Rattikin is that which he had on December 22, 1958, when Bosquez deeded the Sandovals' homestead property to him. Baylor v. Ramos, 290 S.W.2d 273 (Tex.Civ. App., 1956, wr. ref., n. r. e., opinion by Pope, J.). We are here not presented with a case where the only knowledge or notice to Rattikin was that a deed to his prospective Grantor had been executed by the person in possession of the property involved, or that such deed was recorded. Nor are we dealing with a case which depends upon facts coming to a Grantee's knowledge after he has received a deed. In this case the record abundantly shows that, at least, fact issues were presented as to whether Rattikin had knowledge or was placed upon notice

of the Sandovals' claim to continued ownership of their homestead, prior to December 22, 1958, the date of the Bosquez' deed to him, because of the very transaction and the material facts therein involved, whereby he suffered a loss on his title policy, as heretofore mentioned. See Vogel v. Zipp, 90 S.W.2d 668 (Tex.Civ.App., 1936, wr. dism.).

The last cited case reiterates another rule of law which affects the question of Rattikin's knowledge or notice. At 90 S.W.2d 671, the court said:

"It is settled law that, when the consideration for a deed or for a deed of trust lien is a preexisting debt, it will not support the claim of a bona fide purchaser for value without notice, as against the claim that the property so conveyed is the homestead. Steffian v. [Milmo Nat.] Bank, 69 Tex. 513, 6 S.W. 823; Swann v. Rotan State Bank, 115 Tex. 425, 282 S.W. 789; Walter Connally & Co. v. Gaston (Tex.Civ. App.) 295 S.W. 953."

The record in this case clearly discloses that, at all material times herein, the conduct of Rattikin was engaged in solely for the purpose of collecting the pre-existing debt of the Sandovals, evidenced by their Mechanic's Lien Note. Rattikin caused the deed from Bosquez to be executed to him for such purpose. By his attorney's letter of July 9, 1959, he offered to sell the Sandovals their homestead property for $2,044.32, and when such offer was not accepted, this suit was filed on February 12, 1960. In my view, such facts, along with others heretofore mentioned, prevent Rattikin from being a bona fide purchaser for value without notice.

On the basis of the evidence offered on the hearing of the motion for new trial, it is my opinion that, at least, fact issues were shown to exist as to whether the deed from the Sandovals to Bosquez, dated February 14, 1950, was a mortgage, and that Rattikin had notice, or its equivalent, of such fact. A strong argument can be made that, on the evidence presented at the hearing on the motion for new trial, such issues were established as a matter of law in favor of the Sandovals, and, in any event, that opposite findings would be contrary to the great weight and preponderance of the evidence so as to be manifestly wrong and unjust. See Ascension v. Saenz, 349 S.W. 2d 266 (Tex.Civ.App., 1961, n. w. h.).

The Sandovals, through their present counsel, clearly demonstrated to the trial court on the motion for new trial that they had a defense to Rattikin's case which could have defeated it if only they had been accorded the effective assistance of counsel on the original trial of the case. Nevertheless, the lower court denied the Sandovals a new trial.

It does not clearly appear from the record herein that the trial judge should have realized on the original trial of this case that the Sandovals were not being effectively represented, although there were strong danger signals in that direction, particularly because the legal-aid attorney, at the outset, announced that the Sandovals would offer evidence to support their position that the deed to Bosquez was a mortgage; and, within a few minutes thereafter, it appeared there was a total failure to make good on such offer. However, on the hearing of the motion for new trial the issue was squarely presented and the trial judge was charged with the important duty of determining on basis of the allegations and showing then made whether the Sandovals had been deprived of effective representation of counsel on the original trial of the case, and had been prevented from making their defense for such reason.

I am firmly convinced that the lower court erred in not granting the Sandovals a new trial, or perhaps more accurately, *a trial*, because the purported representation of them by the legal-aid attorney amounted to no representation and certainly did not meet any minimum standard of effective assistance of counsel. I believe that this

premise is amply supported by decisions of our courts, both state and federal, including a number of cases decided in recent years.

The basic obligation of an attorney to render effective assistance of counsel to his client in the protection of life, liberty or property, and the right of the client to receive such effective assistance is a long established concept. In the case of Von Moltke v. Gillies, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309 (1948), the opinion of Justice Black includes the following statement:

"Undivided allegiance and faithful, devoted service to a client are prized traditions of the American lawyer."

A footnote reference to such statement in the opinion sets out Canons 15 and 4 of the Americal Bar Association Canons of Professional and Judicial Ethics, as follows:

"Canon 15. The laywer owes 'entire devotion to the interest of the client, warm zeal in the maintenance and defense of his rights and the exertion of his utmost learning and ability,' to the end that nothing be taken or be withheld from him, save by the rules of law, legally applied. No fear of judicial disfavor or public unpopularity should restrain him from the full discharge of his duty. In the judicial forum the client is entitled to the benefit of any and every remedy and defense that is authorized by the law of the land, *and he may expect his lawyer to assert every such remedy or defense.*" (Emphasis supplied).

"Canon 4. A lawyer assigned as counsel for an indigent prisoner ought not to ask to be excused for any trivial reason, and should always exert his best efforts in his behalf."

The Canons of Ethics which govern members of the State Bar of Texas contain several provisions relating to the subject of effective assistance of counsel. Canon 6 refers to "The obligation to represent the client with undivided fidelity." Canon 7 provides, in part, that " * * * it is the right of any member, without fear or favor, to give proper advice to those seeking relief against unfaithful or neglectful counsel * * *." Canon 8 provides, in part, that "A member should endeavor to obtain full knowledge of his client's cause before advising thereon * * *." Canon 19 provides, in part, that "The conduct of a member before the court and with other members should be characterized by candor and fairness." Canon 21 provides, in part, that "A member should not do anything repugnant to his own sense of honor and propriety." Canon 40 provides that an attorney may withdraw from employment under certain conditions, including "even if a member finds himself incapable of conducting the case effectively." (Such Canons are found following Art. 320a-1 V.A.T.S.)

There are several Texas decisions involving the right to effective assistance of counsel in both civil and criminal cases, the necessity of judicial sensitivity to the protection of constitutional rights, and the relationship of such matters to constitutional due process. See Lopez v. Calzado, 281 S.W. 324 (Tex.Civ.App., 1926, wr. dism.); Madero v. Calzado, 281 S.W. 328, second case. (Tex.Civ.App., 1926, wr. dism.); Rodriquez v. State, 170 Tex.Cr.R. 295, 340 S.W.2d 61 (1960); Ex parte Caldwell, Tex. Cr.App., 383 S.W.2d 587 (1964); Ex parte Davis, 161 Tex. 561, 344 S.W.2d 153 (1961).

In Lopez v. Calzado, 281 S.W. 324, the Court of Civil Appeals at San Antonio reversed a judgment in favor of the plaintiff and remanded the case for new trial because of the lack of effective assistance rendered by appointed counsel who represented defendants cited by publication, and because such ineffective assistance resulted in denying the defendants their day in court. In discussing the respects in which appointed counsel failed to discharge his obligation to his clients, Chief Justice Fly, speaking for the court, pointed out that the appointment of counsel was so that the defendant "may

have any and all defenses presented to which he would be entitled if personally present." The court pointed out, further, that the filing of an answer consisting only of a general demurrer (then permitted) and a general denial did not satisfy the duty of counsel to his clients, and, that special exceptions testing the plaintiff's pleadings, should also have been filed and a hearing held before the court on them. The court also said that when the appointed attorney failed to discharge his obligation, there was a duty on the trial judge to intervene and direct presentation of defenses to which the defendants might be entitled and in connection with "having proper testimony presented and improper excluded." In such a case, the court said, the defendants' rights "can only be guarded by the court, and the attorney appointed by the court." The Court of Civil Appeals further pointed out that proper objections were not made to testimony involving transactions with decedents and to opinions as to the laws of Mexico about which the witness was not shown to be qualified, and that pleas of limitation, which would have presented good defenses, were not filed by the appointed attorney. In concluding the opinion, the court, at 281 S.W. 326, said:

"The plaintiffs in error have not had their constitutional day in court, nor had their rights protected as the law intended, and the judgment will be reversed and the cause remanded."

In a companion case to Lopez v. Calzado, supra, the Court of Civil Appeals at San Antonio handed down its opinion in Madero v. Calzado, 281 S.W. 328 (being the second case on page 328 with the same style), the opinion being written therein by Associate Justice Edward W. Smith. The facts in the two cases were similar, but the defendants were different. Counsel was appointed in both cases to represent the defendants cited by publication. Justice Smith, speaking for the Court in Madero v. Calzado, discussed the respects in which appointed counsel failed to render effective assistance to his clients in that case, similar, in many respects, to the situation in Lopez v. Calzado, and emphasized the duty of the trial judge to intervene when the lack of effective assistance of counsel became apparent. In Madero v. Calzado the court concluded that a judgment obtained under the procedures there disclosed "ought not to be permitted to stand, but should be set aside, and a new trial granted in order to give the defendants an opportunity to have their rights adjudicated in accordance with established rules of practice and procedure."

At page 330 of the opinion, the court said:

"The duty of an attorney appointed in such cases is not merely perfunctory in its nature, notwithstanding the probable fact that it has grown to be a custom to thus lightly treat that office. For it is the duty of such attorney to defend the rights of his involuntary client with the same vigor and astuteness he would employ in the defense of clients who had expressly employed him for such purpose. In suits of this character, nothing can be admitted against the interest of the absent defendant, and the one chosen to represent that interest in a case stands in court to insist that no pleading shall go unchallenged, no step shall be taken, no act done, no evidence produced, which shall in any manner be legitimately the subject of an objection or exception."

"Such being the spirit and intent of the statute, and it being the duty of the trial court under that statute to appoint the attorney to represent the absent defendants, we conclude by the same token that when the appointed attorney hesitates or fails to perform his duty in the manner contemplated by the statute, it becomes the further duty of the trial judge to take the initiative and interpose his own authority to enforce orderly and legal procedure, and protect the absent parties from gross infractions of the rules of pleading or evidence."

The cases of Lopez v. Calzado, supra, and Madero v. Calzado, supra, by the San Antonio Court of Civil Appeals, are, indeed, land-mark decisions on the proposition that helpless defendants who must rely upon appointed attorneys in civil cases are entitled to the effective assistance of counsel and to be protected by such counsel and the trial court in seeing to it that they will not be deprived of their constitutional day in court.

In Rodriguez v. State, 170 Tex.Cr.R. 295, 340 S.W.2d 61 (1960), the Court of Criminal Appeals reversed a conviction because of the lack of effective assistance of appointed counsel who made a number of serious mistakes during the course of the trial. At page 63 of the opinion, the court said:

"Courts are slow to express an opinion as to whether a licensed member of the bar, authorized to practice law in the state, is competent to do so or has adequately represented and protected the rights of a client, but when it appears from the entire record that accused has not been adequately represented, courts should not hesitate to say so."

In Ex parte Caldwell, Tex.Cr.App., 383 S.W.2d 587 (1964), the court granted habeas corpus setting aside a death penalty conviction because inexperienced appointed counsel in the trial court failed to give notice of appeal and the Court of Criminal Appeals did not acquire jurisdiction for regular review. The court set aside the conviction on that ground that " * * * the rights of an indigent accused were not properly safeguarded * * *."

The four Texas cases just discussed (Lopez, Madero, Caldwell and Rodriguez) clearly demonstrate that in a proper case, a defendant, either in a civil or criminal proceeding, will be granted relief and a new trial where he has suffered injustices due to the lack of effective assistance of counsel.

In Ex parte Davis, 161 Tex. 561, 344 S.W.2d 153 (1961), the Supreme Court of Texas held that constitutional due process was denied the relator under the Fourteenth Amendment to the Constitution of the United States, as well as under other federal and state constitutional provisions, because, in the trial court (where Davis was a defendant in a contempt case involving failure to make child support payments, a quasi-criminal proceeding) he was not afforded sufficient notice of the hearing, was not advised that he was entitled to further time in which to obtain counsel and prepare for trial. Davis' failure to protest was held not to be a waiver of his rights or a consent to trial. The court cited Ex parte Hejda, 118 Tex. 218, 13 S.W.2d 57, wherein it was held that relator there was denied constutitional due process, and quoted from the opinion, in part, as follows:

" ' "Due process of law" ordinarily includes: (a) Hearing before condemnation; (b) accordance of reasonable opportunity to prepare for the hearing. Mandate of reasonableness of opportunity may not be attenuated to mere formal observance by judicial action, * * *.' "

In Ex parte Davis it appeared that the relator was a deaf mute who had received only two days notice of the contempt hearing at which he was ordered punished and confined in jail until he paid delinquent child support payments as well as a fine and costs. At page 157 of 344 S.W.2d the court said:

"The facts which are important here are the brevity of notice, the physical handicap of relator and resulting difficulty of communication and understanding, the absence of counsel at the hearing, the failure to advise relator of his right under the statute and rule to additional time in which to obtain counsel and prepare for trial, and the failure to permit the introduction of further evidence when tendered by counsel who was promptly employed. A longer period for preparation, the presence of counsel, and the receipt of additional

evidence might not have led to a different judgment, but due process required that a reasonable opportunity for exerting those influences on the court's judgment be afforded. Ex parte Ratliff, 117 Tex. 325, 3 S.W.2d 406, 57 A.L.R. 541; Cooke v. United States, 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767.''

In Ex parte Davis, it appeared that the combination of factors mentioned by the Supreme Court called into action the judicial guidance of the trial judge, but such was not given. It, therefore, was established that Davis was not given a fair trial—the kind of a hearing guaranteed by constitutional due process—and the court refused to allow the results of such a hearing to stand.

Any serious consideration of the meaning and necessity of effective assistance of counsel must necessarily include the decisions of the Supreme Court of the United States in Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), and Powell v. State of Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158. Gideon v. Wainwright, supra, recognizes the right of an indigent defendant to counsel in a state criminal case where his life or liberty is involved and reiterates the rule as to the right of effective assistance of counsel previously announced by that court in Powell v. State of Alabama, supra. At 372 U.S. 344–345, 83 S.Ct. 796, 797, opinion in Gideon, the court said:

"From the very beginning, our state and national constitutions and laws have laid great emphasis on procedural and substantive safeguards designed to assure fair trials before impartial tribunals in which every defendant stands equal before the law. This noble ideal cannot be realized if the poor man charged with a crime has to face his accusers without a lawyer to assist him. A defendant's need for a lawyer is nowhere better stated than in the moving words of Mr. Justice Sutherland in Powell v. [State of] Alabama:

'The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and the knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence.' 287 U.S., at 68–69, 53 S.Ct., at 64, 77 L.Ed. 158.''

Immediately following the above-quoted portion of the opinion in Powell v. State of Alabama, at 287 U.S. 69, 53 S.Ct. 55, 64, the court also said:

"If that be true of men of intelligence, how much more true is it of the ignorant and illiterate, of those of. feeble intellect.''

In my view, the language of the Supreme Court of the United States in Gideon v. Wainwright, supra, and the quotations from Powell v. State of Alabama, supra, hereinabove set out, need only be paraphrased in minor respects to be properly applicable to the necessity for the effective assistance of counsel in civil cases where property rights are involved.

Recent decisions of the United States Court of Appeals for the Fifth Circuit have

shed much light on the meaning of effective assistance of counsel in criminal cases. See MacKenna v. Ellis, 280 F.2d 592 (5th Cir. 1960), modified on en banc hearing, 289 F.2d 928 (1961); Porter v. United States, 298 F.2d 461 (5th Cir. 1962); Randazzo v. United States, 339 F.2d 79 (5th Cir. 1964); Pineda v. Bailey, Sheriff of El Paso County, Texas, and Dr. George Beto, Director of the Texas Department of Corrections, 340 F.2d 162 (5th Cir. Jan. 12, 1965). In each of said cases the accused was granted relief on account of lack of effective representation of counsel.

The substance of pertinent holdings in the above-cited Fifth Circuit cases will be briefly reviewed. In MacKenna v. Ellis, supra, the court held that the right to counsel means "the right to effective counsel"; that undivided loyalty of appointed counsel to client is "essential to due process"; that a defendant have a fair opportunity to tell his story in a fair trial is "basic to due process"; that a defendant is entitled to "the effective, whole-hearted assistance * * * and to the undivided loyalty of counsel"; that a defendant "is entitled to have his trial guided by a judge sensitive to the duty of protecting the accused's constitutional rights in all cases." In the case of Porter v. United States, supra, the court held, in substance, that "effective representation" is required for a defendant "whether the attorney is one of his own choosing or court-appointed"; that effective representation is lacking where counsel "unknown to the accused and without his knowledgeable assent, is in a duplicitous position where his full talents—as a vigorous advocate * * * are hobbled or fettered or restrained by commitments to others"; that a court may not countenance such ineffective representation, when it appears, and must take "effective action" because, in such circumstances "the trial is not the fair one demanded by the Constitution." In the case of Randazzo v. United States, supra, the court reiterated the holdings and doctrine of Porter v. United States, supra, and held that an attorney who attempted to represent Randazzo on appeal from a sentence for criminal contempt could not do so because (as was suggested by the United States, appellee) a conflict of interest existed which would deprive the appellant "of effective counsel in this appeal" since he was not "unhobbled or unfettered or unrestrained by his commitments to another." A significant holding in Randazzo is that not only is there a duty on the trial court to protect the right to assistance of counsel but "We think this admonition applies equally to appellate courts."

In Pineda v. Bailey & Beto, supra, the most recent decision of the United States Court of Appeals for the Fifth Circuit involving the question of effective assistance of counsel, the court reversed the judgment of a United States District Court denying a writ of habeas corpus from Pineda's final conviction in a Texas court, for which he was sentenced to a maximum of 43 years in the state penitentiary, and the case was remanded to said district court for further proceedings not inconsistent with the opinion. The Court of Appeals held in part as follows:

"As this Court has recently written, more than a formal appointment of counsel is required. There must be effective assistance of counsel. (Footnote 3, appearing at this point, cites the cases of Powell v. State of Alabama, 287 U.S. 45, 71, 53 S.Ct. 55, 77 L.Ed. 158 (1932); Lyles v. Beto, 329 F.2d 332 (5th Cir. 1964); Porter v. United States, 298 F.2d 461 (5th Cir. 1962). Effective assistance does not mean that a defendant is entitled to have the best counsel appointed, or any particular counsel, but it does mean that he must have such assistance as will assure him due process of law. As we said in MacKenna v. Ellis, 280 F.2d 592, 599 (5th Cir. 1960), "We interpret the right to counsel as the right to effective counsel. We interpret counsel to mean not errorless

counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render *and rendering* reasonably effective assistance". (Emphasis is in the published opinion; it is not supplied here).

"A review of the record in this case convinces us that it cannot be said that Appellant's counsel met that standard. The record fails to show that Mr. Bean brought to the defense of Appellant the zeal which the law requires for his defense. His conduct is more consistent with an attempt to go through the formalities of a trial than it is with an interested counsel's best efforts to develop and present his client's case. He spent approximately ten minutes with Appellant prior to his trial to prepare his defense for a charge of murder with malice. His conduct prior to, during, and after trial hardly shows effective assistance of counsel."

&ast; &ast; &ast; &ast; &ast; &ast;

"We need look no further than Powell v. State of Alabama, supra, to describe the situation in this case:

'It is not enough to assume that counsel thus precipitated into the case thought there was no defense, and exercised their best judgment in proceeding to trial without preparation. Neither they nor the court could say what a prompt and thorough-going investigation might disclose as to the facts. No attempt was made to investigate. &ast; &ast; &ast; The record indicates that the appearance was rather pro forma than zealous and active &ast; &ast; &ast;. Under the circumstances disclosed, we hold that defendants were not accorded the right of counsel in any substantial sense. To decide otherwise, would simply be to ignore actualities. &ast; &ast; &ast;' "

At this point it may be well to briefly consider the nature and character of the property right here involved. The Constitution of the State of Texas establishes and guarantees the right of homestead and prescribes the nature and extent of the exemption. Article XVI, Secs. 50–52, Constitution of the State of Texas, Vernon's Ann.St. The homestead exemption is based on considerations of public policy, the purpose being to secure to the family a place for a home and shelter; thus, the welfare of the state is served. It is the policy of the courts to uphold and enforce the homestead laws even though in so doing they sometimes assist a dishonest debtor in wrongfully defeating his creditor. The Constitutional and Statutory provisions granting homestead rights are given a liberal construction in order to secure the fulfillment of their beneficent purpose. It is apparent, from the generous homestead provisions of our laws and the liberality manifested by courts in adjudicated cases, that homesteads are favorites of the law. As a general rule property occupied as a homestead cannot be subjected to the satisfaction of debts or claims against the homestead owner, and such property is not subject to a forced sale except for claims for purchase money, taxes, or improvements made thereon (where the contract is entered into as prescribed by law). Any attempt to create a lien on a homestead other than as permitted by the Constitution is a nullity. A forced sale of the homestead to satisfy a debt of any character other than purchase money, taxes due, or improvements, is void. See 28 Tex.Jur.2d, Homesteads, §§ 1–4, pages 370–375, § 157, pages 571–572.

In dealing with the subject of effective assistance of counsel, some of the cases discuss the matter in terms of "competent counsel". It appears that the term has two meanings. One meaning relates to a lawyer who is duly admitted to the bar and is qualified generally to practice law. If there is a lack of physical or intellectual powers or of actual or legal qualifications on the part of an attorney, he is said to be incompetent with reference to the first said meaning. The second meaning of "com-

petent counsel" relates to counsel's actions or conduct during the handling of the case and, particularly, during the course of the trial. Where some act, omission or negligence (not amounting to fraud or collusion, which subjects appear to be in other categories of misconduct of counsel) results in the denial of a fair trial to a litigant, counsel is said to be incompetent with reference to the second said meaning of "competent counsel." In the present case, insofar as the question of "competent counsel" is concerned, we are dealing with it only within the scope of the second meaning.

Now let us consider further the conduct of the legal-aid attorney in this case; what he should or should not have done in the light of what his clients had a legal right to expect of him based upon the principles announced in the cases hereinbefore cited.

The legal-aid attorney should not have accepted the Sandovals' case in the first instance unless he could give to them his undivided allegiance, loyalty and faithful service. Since the Sandovals were entitled to the benefit of any and every remedy and defense authorized by the law of the land, they had a legal right to expect the legal-aid attorney to make preparation and assert every such remedy and defense in their behalf. If the legal-aid attorney knew that he could not prepare the Sandovals case for trial or present their defenses to Rattikin's suit, he should have so advised them. In such a situation the legal-aid attorney could have called the attention of the district court to the plight of the Sandovals, in a formal hearing if necessary, and could have asked the court to appoint counsel to represent them under Article 1917, V.A.T.S. This would have been considerably more in line with the legal-aid attorney's duty to give assistance to the indigent than the conduct he actually engaged in, the inadequacy of which is now apparent.

When the case was called for trial in the lower court, the legal-aid attorney should not have announced ready for trial when he knew that he was not prepared to present the defense of the Sandovals. If, at that time, he intended to effectively represent the Sandovals and prepare and present their defense to the court upon the trial of the case, he should have moved for a continuance or postponement of the trial date in order to enable him to carry out such intention. If such continuance or postponement had not been granted, the legal-aid attorney could have asked permission to withdraw from the case for the reason that he was not in position to effectively represent the Sandovals, so that the Sandovals could have had an opportunity to secure other counsel, by appointment of the court, under Article 1917, V.A.T.S., or by other arrangements. When the legal-aid attorney announced ready and proceeded to trial in the lower court, he, in effect, represented to the court and to his clients that he was prepared to give the effective assistance of counsel to which his clients were entitled, and, that he was in position to and intended to present their defense. Such representation obviously misled the court and the Sandovals and resulted in their being deprived of the kind of a fair hearing which the law contemplates.

The testimony of the legal-aid attorney, given at the hearing of the motion for new trial, clearly shows that he could not and did not give his undivided loyalty to his clients and was in a duplicitous position where his full talents as a vigorous advocate were hobbled and fettered by commitments to others. A startling summary of his conduct is found in one answer which he gave at such hearing, as follows: "Well, under the circumstances of my crowded condition of my office—of cases that were on file, I did not have sufficient time to prepare. However, I did not ask for a continuance." At another point in his testimony, the legal-aid attorney said that during "the first three months that I was in office, by actual count, we processed five hundred and twenty-five applications for service." The record establishes that, apparently for such reasons, the legal-aid attorney did not attempt to interview several material witnesses who

had knowledge of the facts surrounding the instrument of February 14, 1950, claimed by the Sandovals to be a mortgage, not a deed, to Bosquez; nor did he summon such witnesses or arrange for their attendance on the trial of the case; neither did said legal-aid attorney offer pertinent documents showing Rattikin's connection with the transaction which gave rise to this suit, as heretofore mentioned. It is further apparent that the legal-aid attorney did not give his clients a fair opportunity to tell their stories on the trial of the case. Such conduct on the part of the legal-aid attorney is a far cry from the zeal and whole-hearted assistance which the Sandovals had a right to expect from him.

The record clearly shows that the legal-aid attorney knew, that as a part of the Sandovals' defense, he was required to offer evidence to show that the deed from the Sandovals to Bosquez, dated February 14, 1950, was a mortgage, but he failed to offer such evidence after stating to the court early in the trial that he would do so. The legal-aid attorney did not make a similar offer of proof with reference to the knowledge or notice of Rattikin concerning such fact; however, he either knew or should have known that the Sandovals' defense would not be complete unless he offered evidence to such effect. Such failure of proof was in the face of an objection made by Rattikin's counsel at the trial, calling attention to the fact that Rattikin was not a party to the transaction between the Sandovals and Bosquez.

Consideration of the whole record in this case leads to the inescapable conclusion that on the trial of this case, the legal-aid attorney did not complete a single step in the direction of developing evidence, which was readily available, to support and establish the Sandovals' defense to Rattikin's suit. His conduct was not such as to assure his indigent, illiterate clients due process of law, which includes a fair opportunity to be heard and a day in court before judgment is rendered. Such conduct of the legal-aid attorney amounted to no representation of the Sandovals; certainly it did not meet any minimum standard of competency in the sense we are considering it here. This is not a case which involves trial strategy or the exercise of judgment as to alternatives in representing a client. Instead, it appears that there was a clearly charted course which was required to be followed if the Sandovals' defense was to be presented, and the legal aid attorney utterly failed to pursue that course as a reasonably prudent, competent attorney would have done.

This is not a case in which the conduct and negligence of a trial attorney can be charged or imputed to his clients. The Sandovals did not waive such conduct or consent to the trial under the conditions disclosed by the record herein. Ex parte Davis, supra. The Sandovals, because of their poverty, had no choice of selection as to the legal-aid attorney furnished them by the County; neither were they in position to exercise control over him from the standpoints of either ability or understanding; they lacked both. The Sandovals only hope for proper representation at the trial was found in the legal-aid attorney furnished by the county. Their reliance on him was the slender thread by which their homestead dangled. The legal-aid attorney was the only link between the Sandovals and the trial court. The Sandovals had a right to expect the said attorney to assert on their behalf every remedy or defense authorized by the law of the land, and he failed to do so.

In the situation presented here, where legal-aid counsel is furnished by the county to indigent defendants in a civil case involving their homestead property rights, the demands of procedural due process will not be met unless the counsel so furnished provides assistance that satisfies a minimum standard of competency. In my opinion the conduct of the legal-aid attorney in this case did not satisfy such minimum standard.

The Sandovals were physically present at the trial of this case, but from the stand-

points of language and understanding they were just as "absent" as the defendants in Lopez v. Calzado, supra, and Madero v. Calzado, supra, who were cited by publication and did not appear, necessitating the appointment of an attorney for the protection of their interests. The position of the legal-aid attorney in this case in representing the Sandovals was not essentially different from that of appointed counsel in the last-mentioned cases; and the failure of legal-aid counsel in this case to render effective assistance of counsel to his clients is just as pronounced, perhaps more so, as the failure of the appointed attorneys in the cases just referred to. The Sandovals, because of the language barrier and the difficulty of understanding, were as much in need of the effective assistance of counsel as the Relator was in Ex parte Davis, supra. The denial of constitutional due process because of the absence of a fair hearing in this case is in the same category as that in Ex parte Davis, supra. The decisions of the federal courts, hereinbefore referred to, furnish examples of cases where the lack of effective assistance of counsel, no more aggravated than in this case, has caused the courts to grant relief and new trials to the parties suffering injustice due to such lack of constitutional due process.

The trial court is not simply a casual observer with relation to the rights of the litigants before it in a case. Although the court does not have a duty to present the case for either of the parties, it does have a duty to determine whether there is fairness, certainly a minimal fairness, in the hearing and to furnish the appropriate judicial guidance mentioned in the cases heretofore cited. We are not dealing here with a collateral attack on a judgment brought in a separate case. The motion for new trial filed by the Sandovals was an important part of the trial in the court below. The purpose of a motion for new trial is to enable the trial court, while it still has control over the judgment, to set it aside on a proper showing if it has been rendered on a legally improper basis. The trial court, on the hearing of such motion does not determine issues on the merits, but does so only for the purpose of deciding whether a new trial should be granted. Where, upon the hearing of a motion for new trial, it is properly established that an indigent, illiterate defendant in a civil case has been deprived of the effective assistance of counsel furnished by the County, as in this case, and has not had a fair opportunity to prevent his defenses, without his fault, in my opinion there is no room for exercise of discretion, and the trial court not only has the power, but also has a clear duty to set aside the judgment rendered and to grant a new trial so that constitutional due process may be afforded.

In my view, the showing made by the Sandovals in the lower court required the granting of their motion for new trial and there was no room for the exercise of discretion. I believe there was a duty to grant the new trial because it conclusively appeared that the Sandovals had been deprived of their Constitutional day in court and of due process due to the lack of effective assistance of counsel, and that they had available defenses, which, if presented, could have caused a different result. However, if such premise is not correct and an exercise of discretion was permitted, then, I believe that a clear abuse of it was established. See Craddock v. Sunshine Bus Lines, 134 Tex. 388, 133 S.W.2d 124 (1939); Smith v. Hillsboro State Bank, 253 S.W.2d 897 (Tex.Civ.App., 1952, n. w. h.).

In the leading case of Craddock v. Sunshine Bus Lines, 134 Tex. 388, 133 S.W.2d 124 (opinion by Judge Hickman), the court reviewed the decisions concerning the setting aside of default judgments and, at page 126 of the opinion, held as follows:

"While trial courts have some measure of discretion in the matter, as, in truth, they have in all cases governed by equitable principles, it is not an unbridled discretion to decide cases as they might deem proper, without reference to any guiding rule or principle. Trial judges

desire and are entitled to have a principle or rule to guide them, and we, therefore, reannounce, in slightly changed language the rule established by the above authorities, as follows: A default judgment should be set aside and a new trial ordered in any case in which the failure of the defendant to answer before judgment was not intentional, or the result of conscious indifference on his part, but was due to a mistake or an accident; provided the motion for new trial sets up a meritorious defense and is filed at a time when the granting thereof will occasion no delay or otherwise work an injury to the plaintiff. This is a just rule. It prevents an injustice to the defendant without working an injustice on the plaintiff. Such a rule has the sanction of equity."

In the case of Hillsboro State Bank, 253 S.W.2d 897 (Tex.Civ.App., 1953, n. w. h.) where the trial court proceeded to trial in the absence of appellant and his counsel, the Court of Civil Appeals held that appellant was entitled to a new trial upon showing that such absence was unavoidable due to the participation of appellant's attorney in another trial as a witness and that appellant had a meritorious defense to appellee's cause of action. The court cited with approval a number of cases, including Craddock v. Sunshine Bus Lines, supra, and Hovey v. Halsell-Arledge Cattle Company, 176 S.W. 897 (Tex.Civ.App., 1915, n. w. h.) which held that "The right of a party to a reasonable opportunity to appear in court upon the trial of a case and present his side of the controversy is fundamental."

If there was any room for exercise of discretion by the trial court in this case, I believe that the reasoning of Craddock v. Sunshine Bus Lines would be applicable. Obviously, the failure of the legal-aid attorney to effectively represent the Sandovals was not intentional on their part, nor was such failure the result of their conscious indifference, but was at most due to excusable mistake on the Sandovals' part in placing reliance upon the legal-aid attorney whose conduct did not measure up to a minimum standard. The motion for new trial in the instant case was timely filed so that injury would not have resulted to Rattikin if it had been granted. The case could have been re-tried by present counsel for the Sandovals within a comparatively short time after the original trial. Rattikin would have had a second chance to prove his case in such event upon a fair hearing to all parties.[8] If there was discretion to be exercised by the trial court in ruling on the Sandovals' motion for new trial, I would hold that such discretion was clearly abused.

It has also been held that an abuse of discretion is established in overruling a motion for new trial where the negligence of an attorney is coupled with unauthorized acts on his part. See McMillan v. McMillan, 72 S.W.2d 611 (Tex.Civ.App., 1934, n. w. h.), where at page 612 of the opinion, the court said:

"An application for a new trial and to set aside a judgment on equitable grounds, is addressed to the sound discretion of the court, and should in all cases be granted when the substantial rights of the parties have been so violated as to make it reasonably clear that a fair trial was not had."

The legal-aid attorney in this case made a stipulation with opposing counsel which per-

---

8. Anything said in this opinion is without prejudice to any right of Rattikin to assert any cause of action he may have in the event a new trial should ultimately be granted in this case. If Rattikin has a valid cause of action on the Mechanic's Lien Note or for reformation of the instruments containing the incorrect property description as heretofore mentioned, he should be allowed an opportunity to assert the same, if he desires to do so, subject to any defenses the Sandovals may have. However, such proceeding, obviously, would afford the Sandovals an opportunity to salvage their homestead even if the judgment went against them, which opportunity they would not have in a Trespass To Try Title Suit.

mitted Rattikin to offer into evidence two certified copies of deeds, heretofore mentioned, without their being filed and without giving the notice required by the Texas Rules of Civil Procedure. Without such stipulation, Rattikin could not have proved his chain of title by the instruments which he actually used on the trial of the case. There would have been no proof of the common source of title without them. There is nothing to show that the Sandovals were aware of such oral agreement between the legal-aid counsel and Rattikin's counsel or that they authorized the same. Under the doctrine of McMillan v. McMillan, supra, there would be an abuse of discretion in overruling the Sandovals' motion for new trial because the negligence of the legal-aid counsel was coupled with unauthorized conduct on his part which was in violation of the Rules.

In my view, it is a dark day when a judgment depriving indigents, such as the Sandovals, of their homestead property rights (even though their monetary value is small), is permitted to stand on the basis that the trial court properly denied their motion for new trial within permissible exercise of discretion. It would be a cruel rule of law which allows the State to furnish legal-aid counsel to an indigent defendant and thereafter deny him a new trial because the indigent is supposedly chargeable with the negligent conduct of such counsel, in not presenting his defenses at the trial. Such a rule is not in accordance with the concept of due process of law and is not in accordance with the long-standing and customary standards prescribed for attorneys and the courts.

State action, within the requirements of the Fourteenth Amendment, is present here, because such action refers to exertions of state power in all forms, including judicial action. Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161; Griffin v. People of State of Illinois, 351 U.S. 12, 76 S. Ct. 585, 100 L.Ed. 891; Douglas v. State of California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811; Coffman v. Bomar, 220 F. Supp. 343 (USDC Tenn., 1963). In our case, the Sandovals were first denied due process by the conduct of the legal-aid attorney furnished by the County, and, secondly, when the trial court refused to grant a new trial on the showing made by them that they had been denied their day in court because of the lack of effective assistance of counsel.

I have discussed the foregoing matters with the thought in mind that the subject of effective representation of counsel for indigents in all cases is one of the greatest legal and social problems of our day.[9] There is no intention to reflect upon the trial court, who undoubtedly was acting in good faith, in the light he had at the time of decision; but he was without the record, time and longer look which an appellant court judge is afforded. Nor is there any intended reflection upon legal-aid counsel, who was apparently acting under a misapprehension of what he was called upon to do under the pressure of the condition of his office and work load.[10] On the hearing of the motion for new trial the legal-aid at-

9. See, for example, the book "Equal Justice For The Accused" by a Special Committee of The Association of the Bar of the City of New York and The National Legal Aid and Defender Association, Doubleday and Company, Inc., 1959. See, also the annotation to the case of Lunce v. Overlade, 244 F.2d 108 (7th Cir., 1957), 74 A.L.R.2d 1384, 1390, concerning incompetency of counsel; and, comment on the subject of appointment of counsel for indigent accused in Vol. 28, page 236, Texas Law Review (1949).

10. The legal-aid attorney testified he had been an attorney for about 52 years at the time of trial. Martindale-Hubbell Law Directory verifies this and further shows that said attorney was born in 1883, which on such basis would make him about 80 years of age at the time of trial. The only testimony concerning specific experience on the part of the legal-aid attorney was to the effect that he had been in the abstract business at Laredo for a number of years.

torney frankly admitted his lack of preparation for the trial and he is to be commended for disclosing the facts upon which we must rely. However, the fact that the legal-aid attorney could, in effect, say "I am sorry" would not in itself correct the results of his conduct which denied the Sandovals a fair trial; only the court could take action to correct the injustice which had resulted.

Thousands of dedicated men and women have worked diligently in the legal-aid movement over a period of many years toward the goal of assuring competent representation for those persons who are too poor to employ a lawyer. But such efforts have always been directed toward an objective which would afford representation which is experienced, competent and zealous.[11] Long ago, Chief Justice Charles Evans Hughes said:

> "Whatever else lawyers may accomplish in public affairs, it is their privilege and obligation to assure a competent administration of justice to the needy, so that no man shall suffer in the enforcement of his legal rights for want of a skilled protector, able, fearless and incorruptible." (Report of the Forty-Third Annual Meeting of the American Bar Association (1920), p. 234.)

Article 1917, V.A.T.S., providing for assistance of counsel to indigents in civil cases, was passed many years ago, yet there is not a single reported case involving it. Said statute was, undoubtedly, enacted for the purposes to which the legal-aid movement is dedicated, and as pointed up by the words of Chief Justice Hughes. The legal-aid attorney in this case directly called the attention of the trial court to the facts surrounding his participation in the case for the Sandovals as a legal-aid attorney, and the court accepted him as their attorney on such basis. I have no doubt that the lower court would have appointed an attorney to represent the Sandovals under Article 1917,

V.A.T.S., had they appeared without counsel and made known their plight, through an interpreter, to the court. I further do not doubt that had the lower court appointed an attorney for the Sandovals and his conduct was shown, on the motion for new trial, to be the same as that of the legal-aid attorney in this case, the court would certainly have granted a new trial. The Sandovals had a legal right to assume that the representation afforded them by the legal-aid attorney would be effective to present their defense, not simply a pro forma appearance which would deny them a hearing.

The conclusions I have expressed in this opinion, and which I think should control the disposition of this case, are strictly limited to its context—the particular issues, facts and circumstances here presented in the light of applicable rules of law. Although some of the statements made might be applied to other situations involving the question of effective assistance of counsel, it is my intention and purpose to restrict what I have said here to the specific case before the court, i. e., where indigent defendants are furnished by the county with legal-aid counsel in a civil case and said attorney does not render effective assistance of counsel in preparing and presenting to the court the defense of such indigents which, if established, would have defeated the cause of action asserted against them, and where such conduct of the attorney is not legally chargeable to the clients, but is without their fault; and where the trial court refuses to grant a new trial to such indigents upon a proper showing of such facts.

I am certain that in the overwhelming majority of cases tried in our country, attorneys, whether retained, appointed or furnished as legal-aid counsel, actually render effective assistance of counsel to their clients and measure up to the high standards of conduct which our adversary system requires. However, that fact should not deter a court from holding in a proper case, such

11. See footnote 9.

as this one, that the lack of effective assistance of counsel has offended due process of law and that a defendant who has suffered the loss of property rights under such conditions should be granted a new trial so that he may be afforded his constitutional day in court, which includes the right to a hearing with the effective assistance of counsel.

In my view, the plea of the Sandovals for a new trial, based upon a denial of due process and a judgment in the court below which cuts the ground from under their feet and sweeps the roof from over their heads, should be heeded. I believe that the Fourteenth Amendment to the Constitution of the United States, under the conditions shown here, should and does protect them in their right to a fair hearing.

In the present posture of this proceeding four judges have passed on the Sandovals' case and my voice has been the only one raised in behalf of their right to effective assistance of counsel as opposed to the patently ill-prepared, mis-understood, ineffective representation doled out to them in the lower court. I hope and believe that the Sandovals will fare better in the further course of their appeal. Whether they ultimately prevail on the merits of the case is not the real issue, but whether they are accorded their day in court with the effective assistance of counsel is the all-important consideration. I have an abiding conviction that the principle for which the Sandovals are fighting will prevail. Perhaps the Sandovals have lighted a candle, the flame of which will help to dispel the darkness which seems too often, even at this late hour, to engulf the right of an indigent defendant to secure effective representation of counsel for the protection of his property rights in a civil case.

An affirmance of the judgment in this case which awards the title and possession of the Sandovals' homestead to Rattikin on the record now presented, in my view, tithes mint and dill and cummin while neglecting the weightier matters of law and justice.

I would reverse the judgment of the lower court and remand the case for trial so that appellants may be accorded effective assistance of counsel and due process of law.

ON MOTION FOR REHEARING

GREEN, Chief Justice.

The appellants' motion for rehearing raises no question other than those heretofore decided by the majority of this court, and in my opinion should be overruled. I agree with the statements of facts and the legal conclusions drawn therefrom as contained in Justice Nye's opinion, and feel that the appeal has been properly decided by this Court.

■ An experienced and able trial judge has twice heard evidence in this case, each time with different counsel representing the appellants. Conflicting testimony on the issues involved was introduced, much more on the full hearing accorded on appellants' motion for new trial than on the first hearing. On this appeal, we must presume, in the absence of findings of facts and conclusions of law, that the trial court resolved every disputed fact issue in support of its judgment. Brawley v. Bowen, Tex.Sup.Ct., 387 S.W.2d 383; Quinn v. Dupree, 157 Tex. 441, 303 S.W.2d 769; Renfro Drug Co. v. Lewis, 149 Tex. 507, 235 S.W.2d 609, 23 A.L.R.2d 1114; North East Texas Motor Lines v. Dickson, 148 Tex. 35, 219 S.W.2d 795, 11 A.L.R.2d 1065. Applying this rule of law to the facts, as reviewed in the majority opinion of this court, I find no reversible error in the judgment of the trial court, or in the order overruling the motion for a new trial.

Appellate judges have this advantage over trial attorneys, that they view trials from hind-sight, after the jury verdict, or the judgment of the court. Many records, seen from such angle, display serious mistakes of omission and commission of the attorneys which in all probability have af-

fected the end result. It is my opinion that we, as an appellate court, should not, because of a mistake or oversight of the attorney representing the losing party, reverse the order of a trial judge who, having heard and observed at first hand the lawyers, the parties, the witnesses, and the facts, has ruled that appellant did receive a fair and legal trial unless we find that there has been a material error committed in the misapplication of the law to the facts as impliedly found by the trial court, or some other error of the trial court probably leading to the entry of an improper judgment. I do not find that such error is shown to have been committed.

In this case, an able and reputable lawyer of fifty-two years experience at the bar agreed to represent appellants in the trial because their first attorney of record asked leave to withdraw for the sole reason as stated in his written motion that appellants had refused to cooperate with him in the defense of the case. The second attorney did appear in the trial of the cause, used his judgment as to how best to defend the case, and lost it. Before criticizing him too severely for not proceeding further with the homestead issue, we must remember that appellee claimed to be an innocent purchaser. The full matter of inadequate representation was presented to the able trial judge on the hearing of the motion for new trial at which appellants were represented by a third set of lawyers, and where much testimony was offered on all issues pertaining to the case. The trial court having overruled appellants' motion, I feel that his judgment should be affirmed, and the motion for rehearing overruled.

NYE, Justice.

The lawyer who represented the Sandovals on the original trial testified that he was Executive Attorney and Legal Aid Director for Nueces County. He did not state that he was in the employ of the County, particularly in the capacity as an attorney. The evidence does not show that his employer was not a private organization, set up by private funds, for the purpose of furnishing free legal advice to indigent persons. Our search of the Statutes and laws of the State of Texas fails to reveal any authorization for such an organization as a governmental subdivision of the State of Texas or Nueces County. In view of the trial court's ruling, we should not presume that the attorney was a public official, furnished to appellants by Nueces County. The Fourteenth Amendment to the Constitution of the United States is not involved in this case.

Further background of the facts undoubtedly considered by the able trial judge reveals from the record that the problem of the Sandovals was brought about originally by their failure to pay the monthly installments due on a home improvement loan contracted by them on their house. Due to an error in describing the property in the mortgage, another lot was designated. Appellee as insurer of the title on the mortgage at the request of the mortgagee paid off the Sandoval debt. Subsequently, appellee purchased the lot from Bosquez which should have been described originally in the mortgage. Although the Sandovals had been delinquent on their obligation many, many months, appellee offered to refinance the property for the amount they had in it, payable in small monthly installments. However, the Sandovals refused the offer, electing to attempt to get the property back free and clear of any mortgage or debt. The trespass to try title action followed.

The appellants, in their motion for rehearing, have failed to show that the trial judge abused his discretion in refusing to grant them a new trial.

I agree and adopt the views as expressed by Chief Justice GREEN. Appellants' motion for rehearing is hereby overruled.

SHARPE, Justice (dissenting).

I respectfully continue to enter my dissent. I wish only to add a few more words

in support of my view that the Sandovals have not been afforded the effective assistance of counsel nor due process of law.

Here, as in so many other areas of the law, the basic problem is one of degree, one of where to draw a line.

The essential facts are not in dispute. Only questions of law are presented in this case. All that is necessary here is the proper application of law to undisputed facts. The effect of facts conclusively established presents a question of law. Whether the conduct of the legal aid attorney—what he did or did not do—constitutes the effective assistance of counsel, presents a question of law. Whether the Sandovals have been deprived of due process of law is a question of law.

The Sandovals are illiterate indigents. Their trial counsel was provided by the State of Texas, through a legal-aid office operated by its subdivision, Nueces County. The Sandovals had a defense which, if sustained, would have caused them to prevail. Their trial counsel did not present this defense; but he could and should have done so. His failure is legally unexplained. Nor can it be excused. Everything he left undone could have easily been done. Beyond cavil the conduct of the legal-aid attorney requires the conclusion that the Sandovals were provided no legal representation at all. The effect of this was to keep them from having their day in court.

To hold against the Sandovals and deny them a new trial in these circumstances is effectively to deprive them of rights guaranteed them by the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States. The requirements of that clause do not compel perfection nor any particularly high degree of competency on the part of counsel furnished by the State for indigents. But that clause does impose minimum standards of skill and effort which may not be violated without depriving the indigent of due process of law. See Lunce v. Overlade, 244 F.2d 108 (7th Cir.1957), 74 A.L.R.2d 1384, 1390, 36 Tex.Law Rev. 224.

The crucial question is whether the Sandovals' legal-aid counsel furnished assistance sufficient to meet those minimum standards. It is still my opinion that he clearly did not.

The concept of effective assistance of counsel is meaningless if the standard is so low that an attorney, as in this case, (1) can accept a case knowing that he does not have time and will not take time to prepare his client's defense, (2) does not understand his client's case because of a language barrier, (3) announces ready for trial when he is not prepared to present his client's defense, (4) does not ask questions of his client on the trial of the case where the client is in position to give potent testimony supporting his defense, (5) does not produce other witnesses who are readily available to give important testimony supporting the client's defense, (6) does not produce readily available documents in possession of his client and the adverse party which support the client's defense, and (7) affirmatively acts against the best interest of his client by making a stipulation as to copies of instruments which are essential to the adverse party's cause of action, which would otherwise be inadmissible, and without which the adverse party could not have proceeded to trial  unless to lose the case.

There was only one way in which the legal-aid attorney could have represented the Sandovals in this case. That was to present on the trial of the case the readily available evidence showing that an essential link in Rattikin's title was a mortgage, not a deed, and that he had notice of such fact. Although the legal-aid attorney was required to follow this clearly defined route in order to present the Sandovals' defense, he did not complete a single step in that direction. We are not dealing with a case involving mere mistake or oversight, but instead, one in which there was, in effect, no representation of the indigent defend-

ants in protecting the title to their homestead.

Since the original opinions herein were handed down, two cases have been reported which I desire to mention briefly. These are Tamburello v. Welch, 392 S.W.2d 114, decided by the Supreme Court of Texas on June 2, 1965, and Schaber v. Maxwell, 348 F.2d 664, decided by the United States Court of Appeals for the Sixth Circuit on July 14, 1965.

In Tamburello v. Welch, supra, the Supreme Court reversed the lower court judgments and remanded the case for new trial. At page 118 of 392 S.W.2d of the opinion, the court said:

"* * * it is our opinion that the trial was so materially unfair that the judgment cannot be upheld."

     *     *     *     *     *     *

"In Texas Employers' Ins. Ass'n v. McCaslin, 159 Tex. 273, 317 S.W.2d 916, we observed that an action or occurrence may be so highly prejudiced and inimical to the fairness of a trial that the burden of going forward with proof is met, prima facie at least, by simply showing the improper act and nothing more. It was also pointed out that the burden of the complaining party is met by showing that the trial which resulted in a judgment against him was materially unfair."

In Schaber v. Maxwell, supra, the Court of Appeals on collateral attack set aside an Ohio State Court conviction for the reason that the defendant was deprived of due process because of lack of the effective assistance of counsel. There, it was held that the court-appointed attorneys for the defendant failed to take an essential step required by Ohio law in order for the defense of insanity to be urged, i. e., the filing of a written plea of "not guilty by reason of insanity." The original trial was before three State Court Judges on waiver of trial by jury, which is permitted by Ohio law. The defendant exhausted his State

Court remedies and certiorari was denied by the Supreme Court of the United States, with Justice Douglas expressing the opinion that the petition should be granted. The issue of incompetency of counsel was not raised in any of the foregoing proceedings, but, thereafter, the defendant sought leave to file a second appeal in the Court of Appeals of Ohio which was denied and no appeal was taken from such action. In addition, the defendant filed an action in habeas corpus in the Supreme Court of Ohio which was denied and no appeal taken. Still later, the defendant filed application for writ of habeas corpus in the United States District Court for the Southern District, Eastern Division, of Ohio, which was denied. That action was reversed by the Court of Appeals, as above referred to. Although it is a criminal case, the holdings and discussion of the Court of Appeals in Schaber v. Maxwell, concerning the lack of effective assistance of counsel and resulting denial of due process are highly material to a civil case where an indigent loses his State Constitutionally protected homestead for the same reasons. At page 673 of the opinion, the Court said:

"Under the facts and circumstances of this case we are of the opinion that petitioner was deprived of due process of law at his trial in the state court, under the standards applied in the decisions hereinabove cited, because of the failure of his counsel to file a written plea of 'not guilty by reason of insanity' and the conclusive presumption of sanity in the absence of a written plea.

"It is to be re-emphasized that petitioner was not in fact tried in the state court on his defense of insanity. There has never been an adjudication as to whether or not petitioner was sane at the time of the commission of the crime. His court-appointed counsel committed error that may have been disastrous to petitioner in trying the case upon a defense of insanity with-

out complying with the Ohio statute. The three judges of the state trial court committed error that was most prejudicial in permitting counsel to rely upon his opening statement as a plea of 'not guilty by reason of insanity.' In practical effect there appear to be crucial points at which petitioner was denied altogether any effective representation by counsel.

"This holding is not intended to be a reflection upon the character, integrity or professional reputation of either of the two court-appointed attorneys who represented petitioner in his criminal trial, both of whom are shown by the record to be reputable and experienced lawyers. We recognize that good lawyers can and do make mistakes; and in this case the mistake of counsel in a sense may have been induced by the failure of the trial court to indicate in any way that a written plea was necessary when counsel informed the court at the outset of the trial that petitioner was relying upon the defense that he was insane at the time of the commission of the crime."

In Schaber v. Maxwell, supra, the Court reviewed some of the rules announced in earlier cases on the subject of effective assistance of counsel. One of these rules is that if the conduct of an attorney "is so incompetent as to deprive his client of a trial in a real sense—render the trial a mockery and a farce is one descriptive expression,—the accused must have another trial, or rather, more accurately, is still entitled to a trial." Mitchell v. United States, 104 U.S.App.D.C. 57, 259 F.2d 787 (1957), cert. denied, 358 U.S. 850, 79 S.Ct. 81, 3 L.Ed.2d 86. Another such rule is that effective assistance of counsel contemplates the conscientious services of competent counsel and mere perfunctory appearance for a defendant is not enough. United States v. Wight, 176 F.2d 376 (2d Cir. 1949), cert. denied, 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586; to like effect, Turner

v. State of Maryland, 303 F.2d 507 (4th Cir. 1962), cert. denied, 364 U.S. 885, 81 S.Ct. 173, 5 L.Ed.2d 105. Another such rule is that "Where the defense is substantially weakened because of the unawareness on the part of defense counsel of a rule of law basic to the case, the accused is not given the effective representation guaranteed him by the Constitution." Poe v. United States, 233 F.Supp. 173 (D.D.C.1964), opinion by Judge Skelly Wright, Circuit Judge sitting by designation, in which services of legal-aid counsel were held to be ineffective. Another such rule is that the guarantee of the Fourteenth Amendment is not satisfied by a mere formal appointment of competent counsel and that a denial of opportunity to confer, consult with the accused and to prepare his defenses, could convert the trial into a "sham". Avery v. State of Alabama, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377. Another such rule is that where the defendant is "ignorant of his rights and unacquainted with the course of proceedings", the lack of skill and incompetency of an attorney will not be imputed to him. Tompsett v. State of Ohio, 146 F.2d 95 (6th Cir. 1944), cert. denied, 324 U.S. 869, 65 S.Ct. 916, 89 L.Ed. 1424, which is a case involving employed counsel.

In Schaber v. Maxwell the defendant's original trial attorneys were reputable, experienced and competent generally, but they did not render effective assistance of counsel specifically in that case because they failed to take a step which was essential to the defense. The original State Court trial judges were referred to by the trial judge in the Federal Habeas Corpus case as "three eminent and respected judges, with a total experience on the Common Pleas bench in excess of fifty years." But the Court of Appeals held, nevertheless, that they had erred in convicting the defendant where he lacked effective assistance of trial counsel. The Court applied the rule that "what was or was not done by the defendant's attorney for his client made the proceedings a farce and a mockery

of justice", and held that on such basis there was no effective assistance of counsel, which deprived the defendant of due process of law under the Fourteenth Amendment.

I agree with the view expressed in some cases that the above-stated rule is too general, harsh and strict. However, we can take it at face value, apply it to the instant case, and the Sandovals still would clearly be entitled to a new trial. There was a total failure on the part of the legal-aid attorney to present their case in any fundamental respect. The Sandovals were deprived of a trial in any real sense. The purported trial was lacking in fundamental fairness and the judgment against them was materially unfair.

None of the arguments advanced in support of denying the Sandovals a new trial will withstand close examination. They will be briefly considered. The presumption of implied findings in support of a judgment applies only to matters of fact where the evidence is conflicting and is sufficient to support the fact sought to be implied. There can be no implied finding of a fact in support of a judgment where it would be directly contrary to a fact conclusively established by the evidence. Not a single evidence-supported fact has been pointed to which can be impliedly found in support of the trial court order denying a new trial in this case. There is no such fact which will uphold that action.

The argument that the legal-aid attorney "did appear in the trial of the case, used his judgment as to how best to defend the case, and lost it" does not explain or justify the clear deficiency which is present here. What kind of judgment could the legal-aid attorney exercise when there was a language barrier between him and his clients, and he did not take time to investigate and prepare the defense, and did not produce the witnesses and documents which would establish it, or, at least, create fact issues as to the same? The answer which seems apparent to me is

that judgment exercised in a vacuum is worthless and ineffective. Here, such alleged judgment amounted to a decision not to defend the case. The legal-aid attorney lost the case, not for himself, but for his indigent clients, because he did not prepare and present on the trial the defense which they clearly had and which should have been urged.

The argument that the Fourteenth Amendment to the Constitution is not involved in this case is untenable. State action within the purview of that amendment is present here because of (1) the conduct of the legal-aid attorney furnished by the County, a subdivision of the State of Texas, in failing to render the effective assistance of counsel, and (2) the action of the trial court in denying the Sandovals a new trial. The cases cited in my original dissenting opinion clearly support this view. Schaber v. Maxwell, supra, is additional authority on the same point because it involves both lack of effective assistance of counsel and State Court judicial action. Admittedly, there is not a word of evidence in the record which would raise the issue or show that the legal-aid attorney was employed by a private organization or paid by private funds. How he was compensated would not be controlling in any event; nor is it necessary that he be a public official, although he testified concerning "The first three months I was in office." The essential fact is that he was the Executive Attorney and Legal-Aid Director for the County and was acting for it in connection with his purported representation of the Sandovals. It is elementary and unquestioned that the action of the trial court in denying a new trial is the exercise of state power by judicial action. The action of this court in denying the Sandovals a new trial is also State action within the meaning of the Fourteenth Amendment to the Federal Constitution.

The remaining arguments asserted in support of Rattikin's position relate to the

fact that the first attorney for the Sandovals withdrew from the case and Rattikin's position as purchaser of their 1953 note. The first attorney did not represent the Sandovals on the trial of the case; if he had, there probably would have been a different result. But he did testify on the hearing of the motion for new trial that one reason he withdrew from the case, which appears to me to be the principal one, was that the Sandovals did not pay him a fee. He also said he had difficulty in keeping contact with them. It is easily understandable that this might be true in the case of South Texas Mexican farm laborers who must try to earn a living by doing seasonal argricultural work in many and distant places. The controlling question here involves only the lack of effective representation of the legal-aid trial attorney, and the withdrawal of the first attorney is immaterial to disposition of the case. It is not unheard of for an attorney to withdraw from a case because a client is unable to pay him a fee. The first attorney further testified that he believed he had referred the Sandovals to the legal-aid office. The present attorneys for the Sandovals are the only ones who have rendered the effective assistance of counsel by establishing that the trial wherein the legal-aid attorney purportedly represented them was lacking in fundamental fairness and in due process of law. As to Rattikin's position, he elected to file a trespass to try title suit based on the purported deed from the Sandovals to Bosquez, instead of suing on the note or for reformation of it and the instruments creating a lien. If he really had a cause of action on such other basis he could have asserted it, but he did not do so. Rattikin did not file suit until 1960, and at that time a substantial portion of the balance of the 1953 note purchased by him was uncollectable as against a plea of limitation. The unusual steps taken by Rattikin in order to try to maximize his recovery are wholly immaterial to disposition of the case or to the proposition that the Sandovals were deprived of due process of law because of lack of effective assistance of counsel.

The Sandovals have, without their fault, clearly been deprived of a trial on the issues as to whether a neighborhood groceryman has required his indigent customer to give him a mortgage in the form of a deed to his homestead as security for a grocery bill, and whether a title company owner, who is trying to recoup a loss on a title policy resulting from his own mistake or that of his agent, had notice that such instrument was really a mortgage, so as to subvert the provisions of our Texas Constitution protecting homestead rights. Many reported cases have struck down as invalid similar attempts to circumvent homestead rights.

In my view, in a case such as this, a minimum standard of effective assistance of counsel requires (1) that the attorney make sufficient preliminary investigation to determine if the client has a defense to the action brought against him, and, if he does, (2) that the attorney produce on the trial of the case the available testimony of witnesses and documents, which tend to establish the client's defense. Anything less than this amounts to no representation at all. That is what we have here.

I believe that we must maintain judicial sensitivity to the rights of the poor as well as to those of other persons. If we subscribe to and apply inadequate concepts concerning effective assistance of counsel and due process of law to the cases of indigents, in my view, our vaunted judicial process will be left poor indeed.

I would reverse the judgment of the lower court and remand the case for new trial.